In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-2104

DANA AULT,

*Plaintiff-Appellant*,

*v.*

LESLIE SPEICHER,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 3:07-c-398—**David R. Herndon**, *Chief Judge*.

ARGUED DECEMBER 6, 2010—DECIDED MARCH 3, 2011

Before BAUER and WILLIAMS, *Circuit Judges*, and
MCCUSKEY, *District Judge*.*

MCCUSKEY, *District Judge*. Plaintiff-Appellant Dana
Ault (Plaintiff) sued Defendant-Appellee Leslie Speicher
(Defendant), an Illinois Department of Children and

---

* The Honorable Michael P. McCuskey, United States District
Court for the Central District of Illinois, sitting by designation.

Family Services (DCFS) Child Welfare Specialist, for violating her rights to familial association under the First, Ninth, and Fourteenth Amendments to the United States Constitution.

Plaintiff claims that Defendant interfered with her parental rights during a DCFS investigation in 2004-2005. The district court granted Defendant's motion for summary judgment. The court found that Defendant did not infringe on Plaintiff's right to familial association because Plaintiff had the option of disagreeing with the service plan prepared by DCFS and could challenge Defendant's authority in state court. The district court concluded that summary judgment was proper because Defendant was entitled to qualified immunity.

Plaintiff has appealed, arguing (1) the district court misconstrued evidentiary facts; (2) there are material facts in dispute regarding Defendant's restrictions on Plaintiff's relationship with her children; and (3) the district court improperly granted summary judgment on qualified immunity. Because we find that the district court properly granted summary judgment based on qualified immunity, the judgment of the district court is affirmed.

## BACKGROUND

Plaintiff is the mother of four children (SY and KY from her first marriage, and TM and CM from her second marriage). Defendant is employed by the DCFS as a Child Welfare Specialist, serving as a caseworker assigned to

coordinate and provide services for families in need. At the time of the incident Plaintiff was divorced and in a relationship with Eric Ogle (whom she later married).

On September 1, 2004, DCFS received a hotline tip of suspected physical abuse of Plaintiff's 4-year old, TM, at the hands of Ogle. DCFS commenced an investigation, and Plaintiff chose to have all four children reside with her mother and stepfather, Teresa and Tommy Samsil, rather than risk having her children placed in foster care. The next day DCFS created a "safety plan," to which Plaintiff agreed, that set as conditions an arrangement for her children to continue residing with the Samsils. The plan expired on September 16, 2004.

DCFS's investigation "indicated" Ogle for physical abuse of TM. The case was an "intact family case" meaning that the family unit remained intact and DCFS did not have any legal relationship with Plaintiff's children. Once the investigation was completed Defendant was assigned as a caseworker for Plaintiff's family because Ogle was indicated for abusing TM and Plaintiff continued to maintain a relationship with him. Defendant developed the first service plan with Plaintiff and Ogle on October 21, 2004, which Plaintiff voluntarily signed.

The first service plan included the following provisions: (1) the children would continue to reside with the Samsils at least through the 2004-2005 school year; (2) they would continue to reside with the Samsils at least until such time that all counselors involved agreed that it would not be detrimental to the children's safety for the family to reunite; (3) Plaintiff and Ogle

would attend counseling and parenting classes; (4) Ogle would attend substance abuse counseling; (5) Ogle's contact with Plaintiff's children would be supervised; and (6) Plaintiff's two oldest children (SY and KY) would attend counseling.

The plan included information regarding the service appeal process if Plaintiff did not agree with any of the provisions. Plaintiff could write down her disagreements and send it to Defendant's supervisor. Plaintiff believed that if she did not sign the DCFS service plans, DCFS could come with the police and take away her children.

In December 2004 domestic battery charges were filed against Ogle in the circuit court based on the same allegations of injuries to TM from the September 1, 2004, DCFS hotline tip. In March 2005 the court entered a no contact order under which Ogle was not to have any contact with Plaintiff's four children. The felony domestic battery charge against Ogle was dismissed in May 2005. Shortly afterward, the state filed a misdemeanor domestic battery charge based on the same allegations. That charge was dismissed in August 2005 on the state's motion, and the no-contact order expired at that time.

In June 2005 Defendant suggested to Plaintiff's mother Teresa Samsil that she and Plaintiff discuss transferring legal custody of the children to Teresa because Defendant was concerned about Plaintiff's stability, poor relationship choices, failure to complete parenting classes or counseling, and uncertain employment situa-



tion. Defendant believed Plaintiff's mother's home was a more stable environment. Plaintiff claims she was terrified that DCFS would take her children away if she did not comply with Defendant.

Relations between Defendant and Plaintiff continued to deteriorate in July 2005. Plaintiff and Ogle had fixed up a trailer and the Defendant did not believe the trailer had suitable living conditions for the children, and thought it best that the children continue to reside with Plaintiff's mother. Plaintiff and Defendant met and Defendant expressed her concerns. Defendant told Plaintiff that if she attempted to take the children from the Samsil house and did not sign over custody to her mother, Defendant would go to court to file for custody.

On July 13, 2005, Defendant wrote Teresa Samsil a letter summarizing her meeting with Plaintiff, and saying she made it clear to Plaintiff that if Plaintiff took the kids from the Samsil home, Defendant would go to the State's Attorney regarding guardianship. Defendant recommended to Teresa that she not allow Plaintiff to take the children from the Samsil home. A second letter to Teresa on July 19, 2005, reiterated the point, that the children should remain in Teresa's "custody." Teresa understood this to mean that she did not have legal custody of the children, but rather that they were to remain living with her and Plaintiff was not to take the children for private visits without supervision. Plaintiff also understood that she remained physically and legally the parent for her children, but felt that if she

did not comply, DCFS could come at any time and take her children. Plaintiff claims that Defendant told her, "on many occasions," that Defendant, and not a court or judge, would "come and take my children if I did not obey orders."

After receiving Defendant's letters, Teresa told Plaintiff that she could visit the children all she liked, but the visits had to be supervised. Plaintiff contacted Defendant to ask why she could not take her children with her and Defendant said it was because she did not feel the children were safe with Plaintiff.

In March 2005 a second service plan was developed containing identical provisions to the first. This was done because charges were still pending against Ogle and Plaintiff continued to maintain a relationship with him. Plaintiff signed the second plan.

A third service plan was created on September 21, 2005, but Plaintiff, on the advice of counsel, refused to sign, as she felt the more she agreed to Defendant's demands, the more Defendant requested of her. Concurrently, on September 18, 2005, the State's Attorney of Clark County filed a Petition for Adjudication of Wardship regarding Plaintiff's children. In an amended petition filed on September 22, 2005, it was alleged that Plaintiff was homeless and unwilling to provide supervision for her four children, and that she failed to take appropriate action to protect TM after he was a victim of physical abuse. On May 5, 2006, the court found the state had failed to prove neglect as to Plaintiff and denied the petition. Three of Plaintiff's children were returned to her, but the oldest decided to remain with the Samsils.

Plaintiff filed suit in the district court pursuant to 42 U.S.C. § 1983, alleging a violation of her due process rights to her "freedom of choice and privacy concerning the care, companionship, upbringing, and nurture of her four minor children" all in violation of the First, Ninth and Fourteenth Amendments of the U.S. Constitution. On March 25, 2009, the district court granted Defendant's motion for summary judgment and denied the summary judgment motion of the Plaintiff. The court concluded that Defendant's actions did not infringe on Plaintiff's right to familial integrity and, even it had found Defendant's actions unconstitutional, the doctrine of qualified immunity would apply to shield Defendant from liability.

**ANALYSIS**

Plaintiff raises three issues on appeal: (1) whether the district court misconstrued evidentiary facts, resulting in an improper grant of summary judgment in favor of Defendant; (2) whether there are material facts in dispute regarding Defendant's unlawful restrictions on Plaintiff's relationship with her children, which precluded summary judgment; and (3) whether Defendant's knowing violation of state law and DCFS regulations resulted in a violation of Plaintiff's constitutional rights, precluding qualified immunity.

Because we find qualified immunity to be dispositive, we will address that issue first and need not address the other issues raised in Plaintiff's appeal.

An appellate court reviews a district court's grant of summary judgment de novo. *Carmichael v. Village of Palatine, Ill.*, 605 F.3d 451, 456 (7th Cir. 2010). The district court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The facts are viewed in the light most favorable to the non-moving party and all reasonable inferences are drawn in her favor. *Carmichael*, 605 F.3d at 456. However, "[i]n a § 1983 claim, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forward with sufficient evidence to create genuine issues of material fact to avoid summary judgment." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010).

"The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not clearly violate established statutory or constitutional rights of which a reasonable person would have known." *McAllister*, 615 F.3d at 881, citing *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009). On a qualified immunity claim the court confronts two questions: (1) whether the plaintiff's allegations make out a deprivation of a constitutional right; and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. *McAllister*, 615 F.3d at 881. The court may address the prongs in whichever order it believes best suited to the circumstances of the particular case at hand. *McAllister*, 615 F.3d at 881.

Plaintiff argues the district court was in error in its finding of qualified immunity, because earlier in the opinion the court had written:

> "Therefore, the court finds, technically, Defendant had no legal authority as a DCFS caseworker to require Plaintiff's children to reside or remain residing with the Samsils as a condition of the service plans, because the children were not actually 'placed' by DCFS prior to the development of any of the service plans. Nor does it appear that Defendant maintained legal authority to subsequently require Plaintiff be allowed only supervised visitation with her children."

Plaintiff claims Defendant knew she was acting unlawfully, but did it anyway, and violated state laws and DCFS regulations, resulting in a constitutional deprivation. We find Plaintiff's argument unavailing because we find qualified immunity shields Defendant from liability for civil damages in this case.

In order to carry her burden of proving that the constitutional right she claims Defendant violated was clearly established, Plaintiff must either (1) present case law that has articulated both the right at issue and applied it to a factual circumstance similar to the one at hand or (2) demonstrate that the "contours of the right are so established as to make the unconstitutionality obvious." *Boyd v. Owen*, 481 F.3d 520, 526-27 (7th Cir. 2007).

Addressing the first prong, Plaintiff has not cited, and the court has not found, any relevant case law from 2006 or earlier that articulates the right at issue of familial

integrity and applies it to factually similar circumstances. Rather, Plaintiff contends that an Illinois DCFS caseworker in Defendant's position should have known she was violating Illinois law, which, Plaintiff argues, is a violation of her clearly established rights to familial association. However, the cases cited by Plaintiff simply stand for the broad proposition that parents have constitutional rights in family choice matters under the Fourteenth Amendment and that interference with those rights by the state must be governed by fair judicial procedures. See *In re J.J.*, 776 N.E.2d 138, 144 (Ill. 2002) (The case concerned whether the State provided clear and convincing evidence of a parent's habitual drunkenness in the year prior to the filing of the termination petition. Plaintiff cited only to broad statements about protection of parental rights in custody cases.). Plaintiff also cites to *In re C.L. and T.L.* and *In re M.K. and K.K.*, but the portion of those cases Plaintiff cites simply stand for the broad propositions that Illinois courts must act with care when interfering with parental rights and must have good cause to place children with a third party. The actual factual circumstances of those cases were distinguishable from the circumstances at issue here. See *In re C.L. and T.L.*, 894 N.E.2d 949 (Ill. App. Ct. 2008) (Case concerned whether the trial court erred by finding the mother dispositionally unfit and granting guardianship to the father after finding him fit.); *In re M.K. and K.K.*, 694 N.E.2d 74 (Ill. App. Ct. 1995) (Case concerned whether trial court abused its discretion in finding abuse and neglect and that it was in the best interests of the children to terminate wardship proceedings.)

The cases Plaintiff has cited do not address circumstances similar to those at issue here and would not have put Defendant on notice she was violating a clearly established constitutional right when she advised Teresa Samsil not to let Plaintiff see her children without supervision. It should also be remembered that, as of July 2005, Plaintiff had already signed two service plans with DCFS and agreed to let the children reside physically with her mother. The Illinois cases cited by Plaintiff, which stand for broad or "high level" propositions concerning familial integrity, would not, under the specific factual circumstances present here, have put Defendant on notice that she was violating any clearly established constitutional right of Plaintiff's. See *Purvis v. Oest*, 614 F.3d 713, 721 (7th Cir. 2010) (high-level observations can be insufficiently precise for the specific circumstances present in a qualified immunity analysis).

Moreover, we agree with Defendant and the district court that, even if Plaintiff could show that Defendant violated Illinois law, failure to comply with state procedures does not demonstrate the violation of Plaintiff's clearly established constitutional due process rights. See *Boyd*, 481 F.3d at 524. In *Boyd*, a plaintiff sued a DCFS investigator and supervisor under § 1983 for violating his due process rights in finding an indication of abuse against him. The district court refused to grant qualified immunity to the defendants because defendants violated DCFS's own rules and regulations. This court reversed, writing that "[t]he Supreme Court has made clear the requirement of due process is not defined by

state rules and regulations, but is an independent determination. (Citations omitted.) Accordingly, the district court erred in determining that the failure to comply with DCFS regulations demonstrated a violation of a clearly established constitutional right." *Boyd*, 481 F.3d at 524. Here, as in *Boyd*, Plaintiff has not shown that a failure to comply with DCFS regulations has demonstrated the violation of a clearly established constitutional right.

We find that the rights at issue in this case were not so clearly established as to make the "unconstitutionality" of Defendant's actions obvious. In summer 2005 Plaintiff was still in a relationship with Ogle and was living in conditions Defendant believed to be substandard. Based on the circumstances of Plaintiff's living arrangements, and Plaintiff's assent to the first two service plans, we do not find it objectively obvious for Defendant to believe that her actions were unlawful or unconstitutional.

Plaintiff cites to *Hope v. Pelzer*, 536 U.S. 730 (2002) and *Gregory v. City of Evanston*, 2006 WL 3718044 (N.D. Ill. 2006) to support her argument that Defendant should have known she was violating an established right. Those cases are distinguishable. In *Hope*, prison guards handcuffed an inmate to a hitching post for seven hours without water or bathroom breaks. *Hope*, 536 U.S. at 733-34. In *Gregory*, police officers arrested two minors for disorderly conduct and took them to separate interrogation rooms at the police station and refused to let them see their parents, despite repeated requests from

both the minors and parents, until the parents signed documents prohibiting their children from being in downtown Evanston for seven days. *Gregory*, 2006 WL 3718044, at *1-2. In those cases the examples were of particularly egregious and obvious violations of law and authority. The rulings of those courts were limited to the particularized facts of the case before them. *Hope*, 536 U.S. at 745 (the Supreme Court referred to the "obvious cruelty" inherent in the defendants' actions); *Gregory*, 2006 WL 3718044, at *6-7. Plaintiff's cases represent extreme situations that would put reasonable state actors on obvious notice of a clearly established constitutional right. The situation in the case at hand is not similar and is clearly distinguishable.

Because we affirm the district court's granting of summary judgment on the basis of qualified immunity, we need not address the other issues raised by Plaintiff on appeal. Accordingly, the district court's opinion granting summary judgment for Defendant is affirmed.

AFFIRMED.